# United States Court of Appeals
## For the First Circuit

No. 17-1634

LUIS ELIAS SANABRIA MORALES,

Petitioner,

v.

WILLIAM P. BARR,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Chief Judge</u>,
Lynch and Thompson, <u>Circuit Judges</u>.

<u>Ilana Etkin Greenstein</u>, <u>American Immigration Lawyers'</u> <u>Association</u>, <u>Gregory Romanovsky</u>, and <u>Romanovsky Law Offices</u>, on brief for petitioner.
<u>Enitan Omotayo Otunla</u>, Trial Attorney, Office of Immigration Litigation, <u>Joseph H. Hunt</u>, Assistant Attorney General, Civil Division, and <u>Zoe J. Heller</u>, Senior Litigation Counsel, on brief for respondent.

July 24, 2020

**LYNCH**, **Circuit Judge**.  Luis Elias Sanabria Morales petitions for review of a decision by the Board of Immigration Appeals ("BIA") to deny his application for deferral of removal under the United Nations Convention Against Torture ("CAT").  We deny the petition.

I.

Sanabria was born in Venezuela on August 7, 1972.  He last entered the United States on November 5, 2012, and was convicted of heroin trafficking in 2014.

On January 21, 2015, the Department of Homeland Security ("DHS") served Sanabria with a notice of intent to issue a final administrative removal order that informed him that he was subject to administrative removal under 8 U.S.C. § 1228(b).  The notice alleged that Sanabria was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) as an alien convicted of an aggravated felony as defined by 8 U.S.C. § 1101(a)(43)(B).

On February 2, 2015, Sanabria requested withholding of removal under 8 U.S.C. § 1231(b)(3) or CAT protection.  He submitted a statement that claimed he feared that drug traffickers who forced him to smuggle drugs to the United States would retaliate against him if he returned to Venezuela.  He also claimed he feared persecution, torture, and death because of his earlier membership in a Venezuelan opposition political party called COPEI.  On February 17, 2015, DHS issued a final administrative

removal order and warrant of removal against Sanabria that found him removable based on his aggravated felony conviction and ineligible for any discretionary relief.

On June 30, 2016, a DHS asylum officer conducted a reasonable fear interview of Sanabria. The officer found that Sanabria's "testimony was sufficiently detailed, consistent and plausible in material respects" and found it credible. Sanabria was placed into withholding-only proceedings and referred to an immigration judge ("IJ").

On August 29, 2016, the IJ gave Sanabria a two-week continuance to file his application and suggested that he find a lawyer. On September 14, 2016, the IJ gave Sanabria another two-week continuance because he was still looking for a lawyer. On September 28, 2016, Sanabria told the IJ that he "talked to one attorney and he promised to visit me this week." The IJ gave Sanabria another three-week continuance. On October 19, 2016, the IJ asked Sanabria if he was still looking for a lawyer. Sanabria answered, "I'm going to do this myself, your honor." He then repeated, "I'm going to represent myself."

On the same day, Sanabria filed an asylum application seeking withholding of removal and submitted documentation in support of his application. On January 17, 2017, he submitted further documentation. On January 26, 2017, an IJ heard the merits of Sanabria's application. Although Sanabria had been provided a

list of attorneys offering pro bono services and granted three continuances to seek counsel, he represented himself.

At the outset of the hearing, the IJ noted that Sanabria's application would be considered an application for CAT deferral of removal because Sanabria's conviction made him ineligible for withholding of removal, either statutory or under the CAT. See 8 U.S.C. § 1231(b)(3)(B)(ii); 8 C.F.R. §§ 1208.17(a), 1208.18(a)(1). Sanabria replied that he was trying to withdraw his guilty plea and instead go to trial, but he did not otherwise dispute the IJ's statement that the conviction limited his application to deferral of removal.

At the hearing, Sanabria testified as follows. Since 1999, Sanabria owned an electronics and clothing store in San Antonio, Venezuela, his hometown. He made numerous trips to the United States to buy inventory for the store. He is married and has one son.

In September 2012, Isaac Alcorcon, the owner of an auto parts store in a nearby town, approached Sanabria to buy a laptop and an iPad. Alcorcon then asked Sanabria if he wanted to work as a drug trafficker. Sanabria refused. Alcorcon later bought another iPad from Sanabria and then called Sanabria to tell him that it was not working and to demand its repair or a refund. When Sanabria went to Alcorcon's business for the repair, Alcorcon was with two individuals, one named Jorge and one wearing a police

- 4 -

uniform. When Sanabria began to use the supposedly broken iPad, he saw that it had been loaded with photos of his wife and child. Alcorcon told Sanabria that he should reconsider his refusal to work as a drug trafficker.

Sanabria ultimately agreed to do so. Alcorcon told Sanabria not to worry because "he own[ed] the police." Sanabria did not report Alcorcon to the police because he believed the police were corrupt and worked with criminals like Alcorcon.

On November 5, 2012, Sanabria traveled from Venezuela to Boston via Aruba after ingesting balloons of heroin. Jorge drove him to the airport in Caracas. Officers from the Venezuelan National Guard escorted Sanabria to his gate so that he could avoid security.

In Boston, an individual called Chiquito met Sanabria. They checked into a hotel in Chelsea, Massachusetts, so that Sanabria could expel the balloons of heroin. Before he had expelled the balloons, Sanabria collapsed in the hotel room, where hotel staff found him. While being taken to the emergency room in an ambulance, Sanabria vomited plastic condoms containing heroin.

Sanabria stayed in the hospital in a coma for four days. After he woke up, he spoke to his wife in Venezuela, who passed on instructions from Alcorcon that he was to waive his right to an attorney, decline assistance from the Venezuelan consulate, and

confess to the police that he had been carrying drugs. Sanabria followed these instructions and was arrested. After his arrest, Alcorcon contacted Sanabria's wife to say that she had done "the right thing."

Sanabria's wife and son then moved twice within Venezuela to hide from Alcorcon. Neither Alcorcon nor other drug traffickers made contact with them after November 2012.

Sanabria was charged in Massachusetts court with conspiracy to transport heroin. He attempted to plead guilty in November 2013, but the plea was rejected when Sanabria raised the possibility of a duress defense. Ultimately, on April 18, 2014, he pleaded guilty to the lesser offense of trafficking in eighteen grams or more of heroin and sentenced to not less than three and a half years and not more than six years. He was the only one arrested or prosecuted, either in the United States or Venezuela.

Shortly after Sanabria's conviction, in 2014, his brother-in-law was killed at Sanabria's store, which was then burned. Sanabria testified that he suspected the drug traffickers killed his brother-in-law and burned his store to threaten him.

Sanabria testified that he feared that he would be persecuted, tortured, or killed if he returned to Venezuela. He said the drug traffickers would learn of his return to Venezuela from connections at the airport.

The IJ denied Sanabria's application. After carefully recounting Sanabria's testimony, the IJ held that Sanabria's conviction was an aggravated felony as defined by 8 U.S.C. § 1101(a)(43)(B) and presumptively a particularly serious crime that barred him from withholding of removal. See 8 U.S.C. § 1231(b)(3)(B)(ii).

With respect to deferral of removal, the IJ then held that Sanabria had not established that it was more likely than not that he would be tortured by or with the acquiescence of the Venezuelan government if he were removed. He noted that Sanabria was unaware of the location of Alcorcon and his collaborators and that Sanabria's wife, son, and mother continued to live in Venezuela, unharmed by drug traffickers or by the government. He also noted that Sanabria had no evidence that Alcorcon was responsible for burning Sanabria's store or killing his brother-in-law, and that the drug traffickers had not contacted Sanabria since his arrest in 2012. For these reasons, the IJ concluded that Sanabria's claim that he would be tortured was speculative.

On February 27, 2017, Sanabria appealed to the BIA. On the basis that his computer access in jail was limited, Sanabria sought and received a one-month extension to file his brief with the BIA. He did not ask for more time to find counsel and ultimately filed his BIA brief pro se on May 8, 2017. He did not argue that his conviction was not for a particularly serious crime

- 7 -

or otherwise challenge the IJ's finding that his conviction rendered him eligible only for deferral of removal. He argued that his fear was not speculative, citing to the country condition report's description of the Venezuelan government's ties to drug cartels. He also submitted new evidence, including an email from his tenant to his wife, recounting a January 2017 incident in which three men in Venezuelan National Guard uniforms entered Sanabria's apartment, asked about Sanabria's whereabouts, and beat the tenant's husband; a police report lodged by the tenant's husband; and a medical report about the husband's treatment after the incident.

On May 24, 2017, the BIA dismissed Sanabria's appeal. It held that Sanabria had not "meaningfully dispute[d] that, as a result of a conviction for a particularly serious crime, he is precluded from being granted either form of withholding of removal." It then "agree[d] with the Immigration Judge that [Sanabria] ha[d] not established eligibility for deferral of removal under the CAT." It found that Sanabria's claim that he would be tortured was "based upon a series of assumptions and speculations." It found that his claims that drug traffickers had burned his store and killed his brother-in-law and that his past political activity would jeopardize his safety lacked support from "any documentary evidence." It noted that his wife, son, and mother continued to live unharmed in Venezuela. Although the BIA

"recognize[d] that human rights abuses occur in Venezuela," it found that Sanabria's own fear was "too speculative in nature and insufficiently corroborated to establish that" he would be tortured by, at the instigation of, or with the acquiescence of a public official or someone acting in an official capacity.

As to Sanabria's new evidence, the BIA found that, although it could support Sanabria's fear of returning to his hometown, it did not establish that he could not avoid harm by relocating within Venezuela, as his family had done. Finally, it found that Sanabria's "speculation" that drug traffickers would monitor his return to Venezuela was unsupported by the record. It denied Sanabria's request to remand the record to the IJ for consideration of the new evidence because it would not "affect the outcome of [Sanabria's] case."

On June 2, 2017, Sanabria filed separate motions to reconsider and remand with the BIA. The record does not establish whether the BIA addressed these motions.

On June 22, 2017, Sanabria timely filed a petition for review with this court. Sanabria filed his opening brief and reply to the government's brief pro se. After counsel agreed to represent Sanabria pro bono in August 2019, the parties filed a round of supplemental briefing.

We must uphold the agency's factual findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Thapaliya v. Holder, 750 F.3d 56, 59 (1st Cir. 2014) (quoting Sunarto Ang v. Holder, 723 F.3d 6, 10 (1st Cir. 2013)). Although "we review the agency's legal interpretations de novo, subject to appropriate principles of administrative deference," we may not entertain arguments not made to the BIA, which "fail[] for lack of exhaustion." Molina De Massenet v. Gonzales, 485 F.3d 661, 664 (1st Cir. 2007). Where, as here, "the BIA adopts and affirms the IJ's ruling but also examines some of the IJ's conclusions, this Court reviews both the BIA's and IJ's opinions." Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012) (citing Matovu v. Holder, 577 F.3d 383, 386 (1st Cir. 2009)).

To be entitled to deferral of removal under the CAT, an alien must show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); Ruiz-Guerrero v. Whitaker, 910 F.3d 572, 575 (1st Cir. 2018). "As part of this showing, [the alien] must establish that the harm would be 'inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" Ruiz-Guerrero, 910 F.3d at 575 (quoting 8 C.F.R. § 1208.18).

In his petition, Sanabria advances three challenges to the BIA's decision. First, he filed new evidence with his opening brief to this court that he argues demonstrates the likelihood that he will be tortured. Second, he argues that the IJ failed to conduct a mandatory factual analysis of whether Sanabria's conviction was for a particularly serious crime and limited his application to deferral of removal. Third, he argues that the IJ misadvised him of the relevant law at his merits hearing by conflating statutory withholding of removal, withholding of removal under the CAT, and deferral of removal under the CAT.

The government urges that we lack jurisdiction to review the BIA's denial of Sanabria's CAT claim, relying on 8 U.S.C. § 1252(a)(2)(C), which provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a [qualifying] criminal offense." But, after briefing concluded, the Supreme Court rejected this argument, holding that because "[a] CAT order is distinct from a final order of removal and does not affect the validity of a final order of removal[,] . . . §[] 1252(a)(2)(C) . . . do[es] not preclude judicial review of a noncitizen's factual challenges to a CAT order." Nasrallah v. Barr, 140 S. Ct. 1683, 1694 (2020). We have jurisdiction to review Sanabria's petition.

We conclude that the record does not compel the conclusion that Sanabria demonstrated eligibility for deferral of

- 11 -

removal under the CAT. See Morris v. Sessions, 891 F.3d 42, 48 (1st Cir. 2018) (taking the same approach). The two documents Sanabria submitted for the first time with his opening brief in this court are a September 1, 2017, letter to Sanabria from the logistics director of COPEI, the opposition party with which Sanabria was involved, and an internal organizational chart for the international airport in Caracas that shows Jorge Alcorcon as the chief of security.

It is clear that we cannot consider these documents. Our review is limited to "the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A). We do not consider documents that are not contained within that record. See, e.g., Nantume v. Barr, 931 F.3d 35, 39 n.4 (1st Cir. 2019) ("[W]e are constrained to consider only the record that was before the agency."); Cabas v. Barr, 928 F.3d 177, 181 n.1 (1st Cir. 2019) (declining to consider materials submitted for the first time with the opening appellate brief).

With respect to the administrative record itself, "we focus our review on whether the record compels a contrary conclusion to the one reached by the [BIA]." Ruiz-Guerrero, 910 F.3d at 575. We conclude that it does not. The BIA specifically noted that Sanabria did not establish that he could not avoid harm by relocating within Venezuela, as his wife, son, and mother already had. Since 2012, the drug traffickers have not tried to

make contact with Sanabria or his relocated family members, much less to harm them. Although Sanabria offered evidence that men wearing Venezuelan National Guard uniforms went to his house in San Antonio, this does not undermine the IJ's finding that he could avoid harm by relocating within Venezuela.

The BIA also correctly noted that Sanabria offered no direct evidence to the IJ, beyond his conjecture that drug traffickers would immediately become aware of his return to Venezuela and would seek to harm him, that he would be tortured. He admitted that he did not know who was responsible for the damage to his store and murder of his brother-in-law, and provided no evidence that it was drug traffickers. And he did not demonstrate that any harm to him would be caused by or with the acquiescence of the Venezuelan government. These shortcomings preclude a conclusion that the record compels a finding that Sanabria is eligible for deferral of removal under the CAT.

Second, there was no error in the BIA's conclusion that the IJ properly found that Sanabria's conviction was for a particularly serious crime. An alien "convicted . . . of a particularly serious crime" is ineligible for withholding of removal. 8 U.S.C. § 1231(b)(3)(B)(ii). The statute further provides that

> an alien who has been convicted of an
> aggravated felony (or felonies) for which the
> alien has been sentenced to an aggregate term

of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

Id. § 1231(b)(3)(B). The Attorney General has determined that an aggravated felony conviction for drug trafficking is presumptively a particularly serious crime under 8 U.S.C. § 1231(b)(3)(B)(ii) absent "circumstances that are both extraordinary and compelling." Matter of Y-L-, 23 I&N Dec. 270, 274 (A.G. 2002). Although Y-L- did not

> define the precise boundaries of what those unusual circumstances would be, they would need to include, at a minimum: (1) a very small quantity of controlled substance; (2) a very modest amount of money paid for the drugs in the offending transaction; (3) merely peripheral involvement by the alien in the criminal activity, transaction, or conspiracy; (4) the absence of any violence or threat of violence, implicit or otherwise, associated with the offense; (5) the absence of any organized crime or terrorist organization involvement, direct or indirect, in relation to the offending activity; and (6) the absence of any adverse or harmful effect of the activity or transaction on juveniles. Only if all of these criteria were demonstrated by an alien would it be appropriate to consider whether other, more unusual circumstances (e.g., the prospective distribution was solely for social purposes, rather than for profit) might justify departure from the default interpretation that drug trafficking felonies are "particularly serious crimes." . . . [S]uch commonplace circumstances as cooperation with law enforcement authorities, limited criminal

- 14 -

> histories, downward departures at sentencing,
> and post-arrest (let alone post-conviction)
> claims of contrition or innocence do not
> justify such a deviation.

Id. at 276–77.

The BIA noted that Sanabria did "not meaningfully dispute" the IJ's conclusion that his conviction was for a particularly serious crime in his appeal to the BIA. The only discussion of his conviction in his brief to the BIA states:

> The only criminal conviction I have is the
> very same reason for my [CAT] request. I
> would have never committed such a crime if it
> wasn't for the death threats against my
> family. This crime jeopardized my freedom and
> was opposed to the moral and values that are
> instilled in me. The Judge rejected my
> petition because he just saw the nature of the
> conviction without overlooking the acts in
> which I was obligated to commit.

Sanabria did not otherwise argue that the IJ should have concluded that his conviction was not for a particularly serious crime or specifically refer to that portion of the IJ's decision.

Even assuming arguendo that this argument is not waived for failure to exhaust administrative remedies, Sanabria's challenge fails on its merits. The IJ correctly recounted the circumstances that led to Sanabria's conviction and invoked the presumption that his conviction constituted a particularly serious crime, referring specifically to Y-L-. The record does not compel the conclusion that Sanabria's conviction was not for a particularly serious crime under the test set forth in Y-L-.

Sanabria agreed to carry the drugs on behalf of an international drug smuggling ring. Although Sanabria was convicted of trafficking in eighteen grams or more of heroin, evidence before the IJ showed that the total drug weight exceeded 200 grams, a much more significant drug quantity. The record also shows that Sanabria received $8,000 as a payment for his services after arriving in Boston. The Attorney General's decision in Y-L- makes clear that "a very small quantity of controlled substance," "a very modest amount of money paid for the drugs in the offending transaction," "merely peripheral involvement by the alien in the criminal activity," and "the absence of any organized crime or terrorist organization involvement" are "all" required "at a minimum" to qualify for the "extraordinary and compelling circumstances" exception. 23 I&N Dec. at 276-77. Even assuming arguendo that Sanabria's sentence of not less than three and a half years but not more than six does not trigger the automatic statutory inclusion of any conviction that resulted in a sentence of at least five years, this record does not compel a conclusion that Sanabria's conviction met each of these factors and demonstrated "extraordinary and compelling circumstances." The six factors give content to the "extraordinary and compelling circumstances" test, and we must abide by them.

Sanabria further argues that the IJ failed to perform the fact-bound analysis required by Y-L-. We assume arguendo that

- 16 -

Sanabria sufficiently argued to the IJ that his conviction did not render him ineligible for withholding of removal. Even so, Sanabria's argument fails.

The IJ's decision thoroughly recited the facts from Sanabria's testimony and then invoked the presumption in Y-L-. The IJ was "not required to dissect in minute detail every contention that" Sanabria advanced. Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007). Rather, the IJ was required only to "fairly consider[] the points raised by [Sanabria] and articulate[] its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion." Id. The IJ was not required on this record to set forth a detailed analysis of the "extraordinary and compelling circumstances" exception.[1] Nor, as explained, did the BIA err by affirming the IJ's decision.

---

[1] By analogy, in the context of clear error review, where a lower court has issued only a brief order in which "specific findings are lacking, we view the record in the light most favorable to the ruling, drawing all reasonable inferences in support of the challenged ruling." United States v. Owens, 167 F.3d 739, 743 (1st Cir. 1999). We do so because "in many situations, the [lower] court's findings or reasons can be reasonably inferred" despite an order's brevity. Cotter v. Mass. Ass'n of Minority Law Enf't Officers, 219 F.3d 31, 34 (1st Cir. 2000). Doing so here in the application of the similar substantive evidence standard, we conclude that the IJ's finding that the presumption was not rebutted was supportable for the reasons described above.

Sanabria does not argue that the IJ's analysis of Sanabria's conviction prejudiced Sanabria's ability to demonstrate the likelihood that he would be tortured. Because the record does not compel a finding that Sanabria's conviction was not for a particularly serious crime, Sanabria's argument that the IJ should have considered his eligibility for withholding of removal fails.

Finally, the record refutes Sanabria's argument that the IJ misadvised him on the law. The IJ correctly advised Sanabria that the application Sanabria had to file for deferral of removal and both kinds of withholding of removal was the same. The IJ did not tell Sanabria that the standards of proof were the same for each kind of relief. Nor does this exchange suggest that the IJ misapplied the standards when considering Sanabria's application.

III.

Sanabria's petition for review is <u>denied</u>.

**-Dissenting Opinion Follows-**

- 18 -

**THOMPSON**, **Circuit Judge, dissenting.** Unlike my colleagues in the majority, I see merit in Sanabria's preserved argument that the IJ failed to evaluate properly whether Sanabria's underlying conviction was for a "particularly serious crime," a term of art in this context that, as the majority discussed and as applied by the IJ and BIA here, had the effect of cutting Sanabria off from certain relief he was pursuing. In my view, the IJ and BIA erred by incorrectly applying the Matter of Y-L- test to assess fully Sanabria's eligibility for relief. And so I write separately to explain why I believe this matter should be remanded.[2]

Before diving in, I want to briefly revisit the law that is so central to my disagreement with my colleagues in the majority. An aggravated felony conviction for drug trafficking is presumptively a particularly serious crime under 8 U.S.C. § 1231(b)(3)(B)(ii), and that presumption is a rebuttable one because it applies only absent "circumstances that are both extraordinary and compelling." Matter of Y-L-, 23 I&N Dec. at

---

[2] I pause briefly at the outset to note that, while my colleagues assume arguendo that this particular argument is properly before us, I would explicitly so find: both before the IJ and then on appeal to the BIA, Sanabria did plenty to raise, and thereby exhaust, the argument that the particularly-serious-crime designation should not apply due to his extraordinary and compelling circumstances. And, therefore, the BIA's conclusion that Sanabria had failed to "meaningfully dispute" the IJ's conclusion that he was ineligible for "either form of withholding of removal" was incorrect.

274. Put differently, the presumptive particularly-serious-crime label automatically affixed to someone who committed an aggravated felony like drug trafficking is not irremovable -- and the way to peel it off is to show that the crime involved extraordinary and compelling circumstances.

But neither the IJ first, nor the BIA later, bothered to assess whether the particularly-serious-crime presumption had been rebutted by Sanabria by way of his efforts to demonstrate extraordinary and compelling circumstances. This, pure and simple, was error. And not only was this error, but this was error we cannot remedy from our appellate perch. I explain.

The IJ certainly was aware of the entirety of the Matter of Y-L- test -- he cited it in his decision and purported to apply it in rendering his decision. Even so, the IJ made no mention of the extraordinary-and-compelling-circumstances piece of the Matter of Y-L- test he relied on. Instead, he let the particularly-serious-crime presumption stand without ever making any extraordinary-and-compelling-circumstances determination, and, by extension, certainly never weighed Sanabria's testimony and other evidence to assess the six Matter of Y-L- considerations. He was dutybound to make those findings because the case he cited required him to do just that.[3] His failure to do so constitutes error.

_____

[3] By the way, the government does not bother to dispute that the back end of the "presumptively particularly serious unless

- 20 -

The same goes for the BIA, which applied the presumption and went no further. Indeed, like the IJ's decision before it, the BIA's decision offers no analysis at all on the extraordinary-and-compelling-circumstances part of the Matter of Y-L- test. Both simply applied the presumption that Sanabria's offense was a particularly serious crime, took withholding of removal off the table, and that was that. No reference to or discussion of the rest of the Matter of Y-L- test and its caveat with respect to extraordinary and compelling circumstances. And so, no conclusion as to whether the showing had been made.

The majority writes that it was not necessary for the IJ "to dissect in minute detail every contention that" Sanabria advanced, but rather he needed only to "fairly consider[] the points raised by [Sanabria] and articulate[] [a] decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion." Raza, 484 F.3d at 128. I don't disagree with any of this. The disconnect here is that the majority thinks assessing the extraordinary-and-compelling-circumstances angle (i.e., applying the Matter of Y-L- test in full, rather than just the default particularly-serious-crime presumption) required some

_____

extraordinary and compelling circumstances are shown" test was not undertaken by either the IJ or BIA, and that that failure does not constitute error. Instead, it simply states its position that such a showing of the requisite circumstances was not made below.

- 21 -

legally unnecessary, painstaking dissection by the IJ, and that engaging in that dissection would have amounted to more than was necessary to give us enough to review.  The majority then concludes that the IJ wasn't required to provide "detailed analysis" of the extraordinary-and-compelling-circumstances component of the test. I, on the other hand, think the interplay of the particularly-serious-crime presumption and extraordinary-and-compelling-circumstances exception in the Matter of Y-L- test required only the fair consideration and "articulat[ion of a] decision in terms adequate to allow [us] to conclude that the [IJ and BIA] thought about the evidence and the issues and reached a reasoned conclusion," which is what Raza contemplates.  484 F.3d at 128. In view of the extraordinary-and-compelling-circumstances prong being completely ignored, it plainly got none of this:  zero consideration, and nothing even approaching a "reasoned conclusion."  Perhaps the IJ wasn't required to provide detailed analysis -- but here, there is no analysis whatsoever, never mind detailed analysis.

And very much tied to this is my colleagues' decision to infer a no-extraordinary-and-compelling-circumstances finding by the IJ that fuels their overall conclusion on this issue.

The majority explains that it's permissible to infer that the IJ found "that the presumption was not rebutted." Pointing analogously to clear-error situations in the district

- 22 -

court, the majority explains that when "specific findings are lacking [from the lower court's order], we view the record in the light most favorable to the ruling, drawing all reasonable inferences in support of the challenged ruling," Owens, 167 F.3d at 743, and this makes sense to do because, "in many situations, the [lower] court's findings or reasons can be reasonably inferred," Cotter, 219 F.3d at 34, despite an order's brevity.

But here's the thing:  Sanabria's case represents the proverbial apples, and Owens and Cotter, taken together, along with any other case out of the district court, are oranges.  Both Owens and Cotter involved the clear-error review of a district court order; Sanabria's case doesn't involve a clear-error review of a district court's fact decision, it involves a review of agency action, meaning the IJ and BIA needed to give some reasoned explanation for the conclusions they reached.

Indeed, we review immigration agency decisions quite differently than we do district court decisions:  "we apply 'normal principles of administrative law governing the role of courts of appeals when reviewing agency decisions for substantial evidence.'"  Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998) ("The need for clear administrative findings is implicit in the statute under which we review the BIA's decision." (quoting Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994))).  And "[w]hile the IJ need not address each and every piece of evidence put forth by a

- 23 -

petitioner, he must at least 'make findings, implicitly if not explicitly, on all grounds necessary for decision.'" Sok v. Mukasey, 526 F.3d 48, 54 (1st Cir. 2008) (quoting Un v. Gonzales, 415 F.3d 205, 209 (1st Cir. 2005)). This court "'must judge the propriety of [administrative] action solely by the grounds invoked by the agency,' and 'that basis must be set forth with such clarity as to be understandable.'" Gailius, 147 F.3d at 44 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)). "Typically, we have found the absence of specific findings problematic in cases in which such a void hampers our ability meaningfully to review the issues raised on judicial review." Renaut v. Lynch, 791 F.3d 163, 169 (1st Cir. 2015) (quoting Rotinsulu v. Mukasey, 515 F.3d 68, 73 n.1 (1st Cir. 2008)).

A driving principle behind all this is that it ensures "that a reviewing court is able to provide intelligent review on issues over which it has appellate jurisdiction." Tillery v. Lynch, 821 F.3d 182, 185 (1st Cir. 2016) (citations omitted); see also Chenery Corp., 332 U.S. at 196-97 ("We must know what [an agency] decision means before the duty becomes ours to say whether it is right or wrong." (quoting United States v. Chicago, M., St. P. & P.R. Co., 294 U.S. 499, 511 (1935))); Harrington v. Chao, 280 F.3d 50, 61 (1st Cir. 2002) (vacating and remanding "is a proper remedy when an agency fails to explain its reasoning adequately."). In Tillery, this court explained that the BIA's decision didn't

- 24 -

"adequately explain its conclusion" -- it provided the legal framework, but then stated only a cursory conclusion with no explanation or legal reasoning. 821 F.3d at 185. And so, in vacating and remanding, the Tillery court concluded that "[i]t is within the agency's realm to elucidate its rationale, and the BIA's failure to do so hinders meaningful judicial review in this case." Id. at 186-87. Indeed, as we've said, "we will accept less than ideal clarity in administrative findings," but "we ought not to have to speculate as to the basis for an administrative agency's conclusion." Renaut, 791 F.3d at 171 (cleaned up).

For me, all of this comes together quite forcefully here not only to support my own point that the IJ and BIA dropped the ball in ignoring the extraordinary-and-compelling-circumstances part of the Matter of Y-L- test, providing no analysis or mention of it at all, but also to underscore the flawed analogy the majority strives to make using Owens and Cotter.

Moreover, totally aside from the fact that Owens and Cotter are horses of completely different colors by virtue of not resulting from agency action, Cotter involved an order in which "the district judge ma[de] no findings and [gave] no reasons" at all, Cotter, 219 F.3d at 34; here, the same can hardly be said for the IJ and BIA in Sanabria's case because the decisions issued by those agencies did offer findings and reasons, just not on the extraordinary-and-compelling-circumstances exception to the test

- 25 -

each purported to deploy. And remember, in Tillery, we vacated when the BIA had identified the legal framework for its analysis but then offered only a cursory conclusion, failing to provide any reasoning from there -- here, the IJ and BIA provided the legal framework, but then didn't even offer a cursory conclusion on the issue as in Tillery, which the court there still deemed inadequate. 821 F.3d at 185.

And beyond that, in Owens, this court, under the "view the record in the light most favorable to the ruling, drawing all reasonable inferences in support of the challenged ruling" standard, inferred enough facts to connect the dots that allowed affirmance of the denial of a motion to suppress evidence. 167 F.3d at 747. Here, the majority is doing far more than inferring some connective facts to support a conclusion: rather, a minimum-showing six-part test went totally ignored by the IJ and BIA, and the majority performed its own analysis of that test, made its own findings, and reached its own conclusion.[4] That's a far cry from deferentially reviewing the matter and upholding a district court's denial of a suppression motion because "it is supported by

_____

[4] And to the extent my colleagues in the majority would be content to conclude the IJ had "implicitly if not explicitly" made findings on the extraordinary-and-compelling-circumstances issue here, Sok, 526 F.3d at 54, I still cannot get on board -- as I just wrote, this was a minimum-showing six-part list of factors that got no mention by the IJ and BIA, and chalking the ignorance of that part of the test by both the IJ and BIA up to an implicit finding is not something this caselaw contemplates.

- 26 -

any reasonable view of the evidence," Owens, 167 F.3d at 743, and in a case like this, it is not permitted, see Makieh v. Holder, 572 F.3d 37, 41 (1st Cir. 2009) (instructing that "we should 'judge the action of the BIA based only on reasoning provided by the agency, not on grounds constructed by the reviewing court,'" and "we will remand if the agency fails to state with sufficient particularity . . . legally sufficient reasons for its decision" (emphasis added) (quoting Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004))). See also Sagaydak v. Gonzales, 405 F.3d 1035, 1040 (9th Cir. 2005) (reasoning that IJs and the BIA are not free to ignore arguments raised, and so the IJ erred by failing to consider extraordinary circumstances proffered to excuse an untimely asylum application).

Along these lines, the majority delves into a discussion of what Sanabria's evidence and testimony did and did not demonstrate. In my view, on the facts of this case and in line with the caselaw I've laid out to this point, this simply goes too far -- it clearly was the IJ's and BIA's responsibility to do this, not ours. As everyone seems to agree, we don't have any findings at all on those circumstances, and it's not our role to jump in and supply them. Nevertheless, the majority runs through the six Matter of Y-L- factors, determining this minimum showing was not met and, as a result, "this record does not compel a conclusion that Sanabria's conviction met each of these factors and

- 27 -

demonstrated 'extraordinary and compelling circumstances.'"  The majority elaborates:  "The six factors give content to the "extraordinary and compelling circumstances" test, and we must abide by them."

Again, this goes much too far.  For starters, as I've said, we, as appellate judges, aren't in the business of making findings that we then use as a springboard to craft the legal analysis that should have been conducted below.  It is completely backwards -- and circular, too -- for us to make our own findings so as to reach our own legal conclusion on an element, then use that conclusion to determine that the record doesn't compel a conclusion contrary to the IJ's and BIA's when, by our own analysis, the IJ's and BIA's conclusions were incomplete.  In other words, we've supplied the complete conclusion to fill the IJ's and BIA's void below -- that Sanabria had not shown extraordinary and compelling circumstances -- and we use that to then say the record below doesn't compel a different conclusion than the IJ's and BIA's (incomplete) conclusion.  This is nonsensical.  And not for nothing, but why is it that we must "abide by" these six factors that "give content to the 'extraordinary and compelling circumstances' test," but condone the IJ and BIA ignoring both the complete test and the six factors

altogether?[5]  All in all, this approach undertaken by the majority is very troubling.

In the end, I'd remand.  As I've said:  the IJ and BIA erred by not determining whether Sanabria has shown extraordinary and compelling circumstances, it's not for us to say whether he made that showing, and we certainly shouldn't be getting into the business of inferring findings in a case like this.  We cannot say whether the record compels a contrary conclusion on this issue unless the conclusion we're given in the first place is complete and offered with the support of analytical reasoning.  Remand is not only the appropriate route, but it is critical to the proper remedy because it would ensure that each of Sanabria's possible avenues to relief has been fairly assessed.

---

[5] My colleagues in the majority also take the time to point out that Sanabria represented himself in the proceedings below.  But this only helps his cause.  Not only does it support my earlier-indicated position that I'd explicitly find this argument exhausted and properly before us, see, e.g., Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008) (noting that, "as a general rule, we are solicitous of the obstacles that pro se litigants face," so we apply "less demanding standards" to pro se litigants), but also prompts me to point out that his pro se status does not in any way lessen the immigration agencies' obligations to enunciate the reasons for rejecting, or in this case ignoring, his sufficiently raised arguments.